UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION at COVINGTON


CIVIL ACTION NO. 09-62-GWU


PIEDAD MCINTOSH,                                                    PLAINTIFF,


VS.                          **MEMORANDUM OPINION**


MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,                    DEFENDANT.


## INTRODUCTION

The plaintiff brought this action to obtain judicial review of an administrative

denial of her application for Disability Insurance Benefits (DIB). The appeal is

currently before the court on cross-motions for summary judgment.

## APPLICABLE LAW

The Commissioner is required to follow a five-step sequential evaluation

process in assessing whether a claimant is disabled.

1.      Is the claimant currently engaged in substantial gainful activity?
        If so, the claimant is not disabled and the claim is denied.

2.      If the claimant is not currently engaged in substantial gainful
        activity, does he have any "severe" impairment or combination
        of impairments--i.e., any impairments significantly limiting his
        physical or mental ability to do basic work activities? If not, a
        finding of non-disability is made and the claim is denied.

3.      The third step requires the Commissioner to determine
        whether the claimant's severe impairment(s) or combination of
        impairments meets or equals in severity an impairment listed

1

in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the Listing of Impairments).  If so, disability is conclusively presumed and benefits are awarded.

4.      At the fourth step the Commissioner must determine whether the claimant retains the residual functional capacity to perform the physical and mental demands of his past relevant work.  If so, the claimant is not disabled and the claim is denied.  If the plaintiff carries this burden, a prima facie case of disability is established.

5.      If the plaintiff has carried his burden of proof through the first four steps, at the fifth step the burden shifts to the Commissioner to show that the claimant can perform any other substantial gainful activity which exists in the national economy, considering his residual functional capacity, age, education, and past work experience.

20 C.F.R. §§ 404.1520; 416.920; Garner v. Heckler, 745 F.2d 383, 387 (6th Cir.

1984); Walters v. Commissioner of Social Security, 127 F.3d 525, 531 (6th Cir.

1997).

Review of the Commissioner's decision is limited in scope to determining

whether the findings of fact made are supported by substantial evidence.  Jones v.

Secretary of Health and Human Services, 945 F.2d 1365, 1368-1369 (6th Cir.

1991).  This "substantial evidence" is "such evidence as a reasonable mind shall

accept as adequate to support a conclusion;" it is based on the record as a whole

and must take into account whatever in the record fairly detracts from its weight.

Garner, 745 F.2d at 387.

One of the issues with the administrative decision may be the fact that the Commissioner has improperly failed to accord greater weight to a treating physician than to a doctor to whom the plaintiff was sent for the purpose of gathering information against his disability claim.  Bowie v. Secretary, 679 F.2d 654, 656 (6th Cir. 1982).  This presumes, of course, that the treating physician's opinion is based on objective medical findings.  Cf. Houston v. Secretary of Health and Human Services, 736 F.2d 365, 367 (6th Cir. 1984); King v. Heckler, 742 F.2d 968, 973 (6th Cir. 1984).  Opinions of disability from a treating physician are binding on the trier of fact only if they are not contradicted by substantial evidence to the contrary. Hardaway v. Secretary, 823 F.2d 922 (6th Cir. 1987).  These have long been well-settled principles within the Circuit.  Jones, 945 F.2d at 1370.

Another point to keep in mind is the standard by which the Commissioner may assess allegations of pain.  Consideration should be given to all the plaintiff's symptoms including pain, and the extent to which signs and findings confirm these symptoms.  20 C.F.R. § 404.1529 (1991).  However, in evaluating a claimant's allegations of disabling pain:

> First, we examine whether there is objective medical evidence of an underlying medical condition.  If there is, we then examine:  (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

Duncan v. Secretary of Health and Human Services, 801 F.2d 847, 853 (6th Cir. 1986).

Another issue concerns the effect of proof that an impairment may be remedied by treatment.  The Sixth Circuit has held that such an impairment will not serve as a basis for the ultimate finding of disability.  Harris v. Secretary of Health and Human Services, 756 F.2d 431, 436 n.2 (6th Cir. 1984).  However, the same result does not follow if the record is devoid of any evidence that the plaintiff would have regained his residual capacity for work if he had followed his doctor's instructions to do something or if the instructions were merely recommendations. Id.  Accord, Johnson v. Secretary of Health and Human Services, 794 F.2d 1106, 1113 (6th Cir. 1986).

In reviewing the record, the court must work with the medical evidence before it, despite the plaintiff's claims that he was unable to afford extensive medical work-ups.  Gooch v. Secretary of Health and Human Services, 833 F.2d 589, 592 (6th Cir. 1987).  Further, a failure to seek treatment for a period of time may be a factor to be considered against the plaintiff, Hale v. Secretary of Health and Human Services, 816 F.2d 1078, 1082 (6th Cir. 1987), unless a claimant simply has no way to afford or obtain treatment to remedy his condition, McKnight v. Sullivan, 927 F.2d 241, 242 (6th Cir. 1990).

Additional information concerning the specific steps in the test is in order.

Step four refers to the ability to return to one's past relevant category of work. Studaway v. Secretary, 815 F.2d 1074, 1076 (6th Cir. 1987).  The plaintiff is said to make out a prima facie case by proving that he or she is unable to return to work. Cf. Lashley v. Secretary of Health and Human Services, 708 F.2d 1048, 1053 (6th Cir. 1983).  However, both 20 C.F.R. § 416.965(a) and 20 C.F.R. § 404.1563 provide that an individual with only off-and-on work experience is considered to have had no work experience at all.  Thus, jobs held for only a brief tenure may not form the basis of the Commissioner's decision that the plaintiff has not made out its case.  Id. at 1053.

Once the case is made, however, if the Commissioner has failed to properly prove that there is work in the national economy which the plaintiff can perform, then an award of benefits may, under certain circumstances, be had.  E.g., Faucher v. Secretary of Health and Human Services, 17 F.3d 171 (6th Cir. 1994).  One of the ways for the Commissioner to perform this task is through the use of the medical vocational guidelines which appear at 20 C.F.R. Part 404, Subpart P, Appendix 2 and analyze factors such as residual functional capacity, age, education and work experience.

One of the residual functional capacity levels used in the guidelines, called "light" level work, involves lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds; a job is listed in this category

if it encompasses a great deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls; by definition, a person capable of this level of activity must have the ability to do substantially all these activities.  20 C.F.R. § 404.1567(b).  "Sedentary work" is defined as having the capacity to lift no more than ten pounds at a time and occasionally lift or carry small articles and an occasional amount of walking and standing.  20 C.F.R. § 404.1567(a), 416.967(a).

However, when a claimant suffers from an impairment "that significantly diminishes his capacity to work, but does not manifest itself as a limitation on strength, for example, where a claimant suffers from a mental illness . . . manipulative restrictions . . . or heightened sensitivity to environmental contaminants . . . rote application of the grid [guidelines] is inappropriate . . ." Abbott v. Sullivan, 905 F.2d 918, 926 (6th Cir. 1990).  If this non-exertional impairment is significant, the Commissioner may still use the rules as a framework for decision-making, 20 C.F.R. Part 404, Subpart P, Appendix 2, Rule 200.00(e); however, merely using the term "framework" in the text of the decision is insufficient, if a fair reading of the record reveals that the agency relied entirely on the grid. Ibid. In such cases, the agency may be required to consult a vocational specialist. Damron v. Secretary, 778 F.2d 279, 282 (6th Cir. 1985).  Even then, substantial evidence to support the Commissioner's decision may be produced through reliance

on this expert testimony only if the hypothetical question given to the expert accurately portrays the plaintiff's physical and mental impairments.  <u>Varley v. Secretary of Health and Human Services</u>, 820 F.2d 777 (6th Cir. 1987).

## DISCUSSION

The plaintiff, Piedad McIntosh, was found by an Administrative Law Judge (ALJ) to have "severe" impairments consisting of being status post two surgeries for a cerebral aneurysm (May 2004 and November 2004); headaches and sinusitis (which may have contributed to her headaches) status post March 10, 2006 surgery; depression; anxiety; and a pain disorder.  (Tr. 15).  Nevertheless, based in part on the testimony of a vocational expert (VE), the ALJ determined that Mrs. McIntosh retained the residual functional capacity to perform a significant number of jobs existing in the economy, and therefore was not entitled to benefits.  (Tr. 16-22).  The Appeals Council declined to review, and this action followed.

At the administrative hearing, the ALJ asked the VE whether a person with a high school equivalent education and the plaintiff's work experience as a storage rental clerk, customer service clerk, and data entry/order filler, could perform any jobs if he were capable of lifting 50 pounds occasionally and 25 pounds frequently, and also had the following non-exertional restrictions.  She: (1) could not climb ladders, ropes, or scaffolds or perform changes of position; (2) could occasionally crawl and climb ramps or stairs; (3) could not work at unprotected heights or work

around hazardous machinery; (4) could perform only simple, routine, repetitive tasks and understand, remember, and carry out only short and simple instructions; (5) could not interact with the general public, coworkers, or supervisors more than occasionally; and (6) could not work in a job requiring more than ordinary and routine changes in work settings or duties, and could make only simple, work-related decisions.  (Tr. 651-2).  The VE responded that such a person would not be able to perform the plaintiff's past work, but she identified other jobs which would be available and gave the numbers in which they existed in the state and national economies.  (Tr. 652-3).

On appeal, this Court must determine whether the hypothetical factors selected by the ALJ are supported by substantial evidence, and that they fairly depict the plaintiff's condition.

Mrs. McIntosh alleged disability due to physical problems resulting from brain aneurysms, which had required surgery on two occasions in 2004.  (Tr. 78).  Loss of vision, low energy, and difficulty walking had resulted.  (Id).  At the administrative hearing, she testified to having both chronic sinus headaches and migraine headaches, dizziness, poor concentration, and depression.  (Tr. 621-3).  Her self-esteem was low, and she had crying spells two or three times a week.  (Tr. 630-1).  She had reduced her social activities, although she would go shopping with her sister.  (Tr. 632, 636).  She was able to take care of her personal needs and could

drive short distances.  (Tr. 633, 636).  The plaintiff's husband, William McIntosh, testified that his wife had become introverted after her aneurysm, was forgetful, and had difficulty following instructions.  (Tr. 644-8).

Medical records in the transcript include reports from Dr. Mario Zuccarello, who performed a clipping operation of a left posterior communicating aneurysm in May, 2004 and an elective clipping of a carotid ophthalmic aneurysm in November, 2004.  (Tr. 149-51, 161).  He noted that she was doing very well after both surgeries (Tr. 161, 196, 206) and by March 14, 2005, the surgeon reported that Mrs. McIntosh had no complaints and no new symptoms, would resume her normal activities, and be reevaluated in five years (Tr. 195).  A state agency physician who reviewed the record at this point concluded that Mrs. McIntosh did not have any "severe" impairment.  (Tr. 216).

Likewise, although there are extensive office notes from the plaintiff's treating family physician, Dr. James Schneider and his associates, Dr. Schneider declined the plaintiff's November, 2006 request "to write a letter in support of her disability," and wrote that "I told Mrs. McIntosh that she really has no significant limitations or impairment at this time."  (Tr. 326).

Other evidence in the transcript regarding the plaintiff's physical conditions includes an indication from Dr. P. Scott Becker, who was evaluating the plaintiff for headaches, that her "benign positional vertigo" had resolved within a few days of

treatment with a "modified Epley's maneuver" (Tr. 385).  Dr. Becker also found a normal examination and did not think that the plaintiff was having migraines frequently enough for prophylactic therapy.  (Tr. 393-4).  Both Dr. Becker and a registered nurse practitioner who treated the plaintiff for migraines suspected a component of rebound headache due to overuse of Tylenol and other medications. (E.g., Tr. 254, 417).  They did not assess any functional restrictions.  Mrs. McIntosh also underwent surgery for chronic sinusitis with headaches, again with no functional restrictions described.  (Tr. 136, 147, 460-2).  Although the plaintiff complained of back pain on occasion, an MRI from May, 2005 showed only mild degenerative disc bulging without significant stenosis (Tr. 211), and Dr. Schneider noted a normal range of motion, no spasm, normal sensation, and normal strength (Tr. 332).

In the absence of any evidence of limitations from treating or examining sources, the ALJ's physical restrictions are amply supported by substantial evidence.

The plaintiff primarily focuses on mental restrictions in her brief.

Mrs. McIntosh underwent a consultative psychological evaluation by Mark D. Kroger, M. S. in August, 2005.  The psychologist reviewed records showing that the plaintiff was complaining of poor concentration, nervousness, and crying spells prior to her brain surgery, although she stated that her concentration problems had

mainly developed after her first operation.  (Tr. 217).  She reported that she could drive only short distances, did limited household chores with help, and spent most of the day cleaning house and resting.  (Tr. 218-19).  She was currently on Zoloft. Educationally, Mrs. McIntosh reported that she completed 12 grades in school in her native Mexico, and had the equivalent of a GED diploma.  (Tr. 219).  She denied any learning disability or educational difficulty.  (Id).  Mr. Kroger found that she had a fair to good ability to follow instructions with only mild limitations related to language or cultural issues.  There was a significant discrepancy in intelligence testing, with a verbal IQ score of 76 and a performance IQ of 60, leaving her full-scale IQ at 66, in the range of mild mental retardation.  (Tr. 220-1).  Mr. Kroger noted that the discrepancy might be reflective of organic deficits, affective difficulties, or a combination of the two.  (Tr. 221).  Achievement testing showed eighth grade reading and spelling and fifth grade arithmetic.  (Id).  He did not diagnose mild mental retardation, because he felt that the achievement testing scores reflected higher cognitive ability.  (Tr. 224).  His impression was of an anxiety disorder, a pain disorder, and "rule out undifferentiated somatoform disorder."  (Tr. 222).  In terms of functional restrictions, the psychologist thought there would be a mild to moderate impairment in the plaintiff's ability to understand, remember, and carry out complex instructions, sustain attention and concentration, tolerate stress and pressure and accept criticism.  She would have a fair to mildly impaired ability

to understand, remember, and carry out simple directions, and a fair to good ability to relate to others.  (Tr. 224).

State agency psychologists who reviewed the record at this point noted that the plaintiff had not initially alleged any mental limitations and thought it was curious that Mr. Kroger did not diagnose mental retardation, borderline intellectual functioning, or a cognitive disorder, in view of the fact that he did not question the validity of the IQ scores.  (Tr. 243).  They thought that the plaintiff's depression had responded well to Zoloft and her primary problem appeared to be "unpredictable fatigue."  (Id.).  They concluded that her allegations were credible, but not to a marked degree of severity.  (Id)  The reviewers checked boxes indicating that Mrs. McIntosh would be "moderately limited" in her ability to understand, remember, and carry out detailed instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, and to respond appropriately to changes in the work setting.  (Tr. 241-2, 311-12).  In Part III of the form ("elaborations on the preceding capacities"), one of the sources stated that she retained the mental ability to understand and remember simple instructions, to sustain attention to complete simple, repetitive tasks, to

12

tolerate coworkers and supervisors, and to adapt to routine changes; the other source made similar statements.  (Tr. 243, 314).

The plaintiff alleges that the ALJ committed error by failing to give controlling weight to an opinion by a treating psychological source, Tom Davis, Psy.D.  Dr. Davis initially evaluated Mrs. McIntosh in March 2006 at the request of her attorney, and performed objective testing, which indicated a "mild cognitive impairment." (Tr. 444).  He also obtained a full-scale IQ score of 66, at the upper end of the mild mental retardation level, but without any significant discrepancy between the verbal and performance scores of 68 and 69, respectively.  (Id).  He felt, however, that the scores seemed "extremely low given the impression of the patient at the time of the evaluation."  (Id).  He concluded that the IQ scores were depressed by the native language and cultural background of the plaintiff, as well as depression.  (Id).  Certain test instruments, such as the MMPI, were interpreted as showing severe depression, consistent with his examination of the patient, and Dr. Davis opined that her depression alone was "totally disabling in its severity."  (Tr. 444-5).  He added that she lacked the ability to concentrate and focus on even simple tasks for extended periods, had difficulty managing more than one task at a time, had limited persistence, and lacked the stamina to participate in a daily work routine.  (Tr. 445).

Subsequently, the plaintiff underwent counseling with Dr. Davis, from September, 2006 to February, 2008, with a gap in treatment between February and

September of 2007 and another gap between September 2007 and January 2008 (Tr. 430-41).  The notes indicate that the plaintiff was also seeing a psychiatrist, apparently a Dr. Alvarez, for part of this period, although there are no notes from this source.  (Tr. 431, 437).  On April 3, 2008, Dr. Davis completed a "Work Capacities Form" indicating that the plaintiff was "markedly limited" in her ability to understand, remember, and carry out detailed instructions, to make complicated work-related decisions, to complete a normal workweek without interruptions from psychologically-based symptoms, to perform at a consistent pace without an unreasonable number and length of rest periods, and to set realistic goals or make plans independently of others.  (Tr. 424-7).  Dr. Davis specifically indicated that his patient had impairments which might interfere with her ability to manage stress.

In discussing the plaintiff's mental restrictions, the ALJ stated that "his mental residual functional capacity attributes an inability to work to cognitive impairment, but his test results indicate only mild cognitive impairment."  (Tr. 20).  The format of the form prepared by Dr. Davis does not have a specific area to list a primary diagnosis, but in answer to the question if there were "any other observations" the psychologist stated that his patient "suffers from cognitive impairment due to frontal lobe brain damage in addition to a mood [disorder.]"  (Tr. 429).  Therefore, in context, it appears that Dr. Davis cited a cognitive impairment *in addition to* a primary mood disorder.  The ALJ also cited what appeared to be an improvement

in the plaintiff's initial level of severe depression with treatment.  (Tr. 20).  However,

the psychologist's most recent note, dated February 21, 2008, indicates that the

plaintiff's mood remained "moderately-severely depressed." (Tr. 430).  Given that

Dr. Davis had initially indicated that the plaintiff's depression alone was disabling,

an improvement to moderate to severe depression is not necessarily inconsistent

with the specific functional restrictions he provided.[1]

For these reasons, the ALJ's decision fails to provide "good reasons" for

discounting the opinion of the treating source.  Wilson v.  Commissioner of Social

Security, 378 F.3d 541, 544 (6th Cir. 2004), citing 20 C.F.R. § 404.1527(d)(2).

Moreover, although the defendant asserts that the hypothetical question

included the restrictions found by the examining source, Mr. Kroger, the hypothetical

did not specifically account for the limitations on stress found by the source, or the

limitations on pace noted by the state agency reviewers.  The Sixth Circuit has

determined that a hypothetical question which fails to include restrictions on the

speed and pace at which a claimant can work does not adequately describe his

limitations.  Ealy v. Commissioner of Social Security, 594 F.3d 504, 516-17 (6th Cir.

---

[1]As the plaintiff points out, the ALJ did not mention the psychologist's initial statement that the depression was disabling.  That statement was not binding on the ALJ, since it was a vocational conclusion outside a mental health professional's area of expertise, and it was also given before a treating relationship had been established.  It does, however, provide a baseline to put the remainder of the psychologist's notes, and his later functional restrictions, into context.

2010).  Therefore, even if the opinion of a treating psychologist had been properly discounted, these failings would require remand for further consideration.

The plaintiff has submitted additional evidence to the Appeals Council and directly to the court.  While this evidence is not part of the court's substantial evidence review, Cline v. Commissioner of Social Security, 96 F.3d 146, 148-9 (6th Cir. 1996), it can be considered along with other new evidence on remand.

The decision will be remanded for further consideration in accordance with this opinion.

This the 7th day of April, 2010.

**Signed By:**

**G. Wix Unthank**

**United States Senior Judge**